DANIELS *et al v.* BARNEY; SAME *v.* WELLS.

CONTRACTS—BOND—EXPRESS COMPANIES.—An action can not be maintained against the principal and surety upon a bond given by an Express agent to secure the faithful discharge of his duties to an Express Company which carries on its business in the State of *Indiana*, without compliance with the requirements of the law of *March* 5, 1855, (1 G. & H. 327,) because, under the provisions of that law, the business of such company, so carried on is illegal. The parties to such bond are bound to know the law, and must be presumed to know that the requirements of the law have not been complied with by the company which were necessary to render the business legal.

CONTRACT—PRINCIPAL AND AGENT.—It seems that, if money due to a principal on an illegal transaction be paid to his agent for him by the party from whom it is due, the principal may recover it from the agent; for the contract or obligation to pay the money to his principal is not connected immediately with the illegal transaction, but grows out of the receipt of the money by the agent for the use of his principal.

APPEAL from the *Marion* Circuit Court.

PERKINS, J.—In 1855, the legislature of *Indiana* enacted:

That all persons, associations of persons, or companies, usually called Express Companies, regularly engaged, or hereafter to be engaged in the business of carrying or transporting packages or parcels of bank notes, coin, merchandise, or other articles, over or upon any of the railroads, rivers, canals, or other thoroughfares in this State, and receiving, or agreeing to receive, compensation for such services, shall be, and they are hereby declared common carriers, and shall be subject to all the liabilities to which common carriers are subject according to law.

SEC. 2. Such persons, associations, or companies, shall file in the office of the recorder of each county in which their business is conducted, or where they may have an agency or

office, a statement showing the full name of every such person and member of every such association or company, and also his or her proper place of residence, and the amount of capital employed in such business; and also an agreement that legal process served upon any agent of said person or persons, association, or company, in such county, shall be deemed and taken as good service upon such person or persons, association, or company; and it shall be the duty of the recorder to make a record of the same, and also to publish in a newspaper of the county, if there be a newspaper, or otherwise to post up in three of the most public places in the county along the proper route or line, a full and complete copy of such statement and agreement, which shall be duly certified by said recorder. Such statement shall be signed by the persons and members of such associations or companies, and shall be verified by oath or affirmation before the same is admitted to record. The recorder shall be entitled to receive and demand from the person or persons, association, or company, for the service herein required, the sum of 5 dollars. Until such notice be given it shall not be lawful for any person, association, or company, to transact the business named in the first section of this act in such county; and any person, member of any association, or company, or any agent thereof, violating the provisions herein contained, shall for every such offence, be guilty of a misdemeanor, and upon conviction thereof shall be fined not less than 10 nor more than 100 dollars, in the name of the treasurer of the county: *Provided,* That nothing contained in this section shall be construed to affect the rights or privileges of persons, citizens of this State, engaged in the ordinary transportation of merchandise, produce, or other articles, in wagons or other conveyances.

SEC. 3. Railroad companies and the owners and masters of steamboats, canal boats, and other vessels, shall not be

exempted from the liabilities of common carriers, by the operations of this act, but may be proceeded against, at the option of the claimant, in case of any loss or damage, where the railroad, steamboat, canal boat, or other vessel shall have been employed in the conveyance of the messenger, or other agent of the person or persons, associations, or companies, named in the first section of this act. 1 G. & H. 327.

In 1860, the *United States Express Company* appointed *Henry W. Daniels,* of *Indianapolis,* agent for said company at that city, and took from him a bond in the penal sum of 2500 dollars, with *Samuel P. Daniels* and *Joshua M. W. Langsdale,* as his sureties, which bond was conditioned thus:

"Whereas the said *Henry W. Daniels* has been appointed agent by and for the said Express company at *Indianapolis* aforesaid; now, therefore, the condition of this obligation is such that if the said *H. W. Daniels* shall well and faithfully do and discharge the services, duties, and obligations as such Express agent, and in such manner that no loss or damage shall accrue directly or indirectly to said company by or in consequence of any act or acts, omission or omissions, failure or laches, unfaithfulness or dishonesty of said *H. W. Daniels* in or pertaining to the business of said Express company, then this obligation to be void," &c.

*Daniels* failed to pay over money received for the transportation of packages, &c., and the Express company sued him and his sureties on his bond, to recover the same. To this suit the defendants answer thus:

"The defendants answer and say that at the time of the execution of said supposed bond, and ever since, the *United States Express Company*, for whose sole use this suit is brought, was an association of persons usually called an Express company, and were then, and ever since have been, engaged in the business of carrying and transporting packages, parcels of bank notes, coin, merchandise, and other arti-

cles over and upon the railroads, rivers, and other thorough-fares in this State and other States of the Union, and receiving and agreeing to receive compensation for such services; and that the employment of said *Henry W. Daniels*, and his appointment as agent for said *U. S. Express Company* mentioned in said supposed bond, was by said supposed bond intended to be, and in fact was, to serve the said Express company in the business aforesaid, to wit: in the county of *Marion*, in the State of *Indiana*. And the defendants say that all the moneys mentioned in the complaint, as having been received by said *Henry W. Daniels*, were received by him in the course of his said employment and agency in the business aforesaid in said county.

"And the defendants further say that the said business' so carried on by said company, and so conducted and prosecuted by said company through said agency and employment of said *Henry W. Daniels*, was and is wholly unlawful in this, to-wit: that at no time before the execution of said supposed bond, nor at any time since, and while said *Henry W. Daniels* was engaged in the employment and agency aforesaid, did said Express company file with the recorder of said county, in which said agency was carried on and in which said company had an office all the time aforesaid, a statement showing the full name of every member of said association and company, and the proper place of residence of each such member, and the amount of capital employed in said business, and also an agreement that legal process served on any agent of said Express company and association, in said county, should be deemed and taken as good service upon said association and company; all which they wholly omitted to do in manner and form aforesaid, contrary to the form of the statute in such case made and provided; of all which the defendants were ignorant till the time of the commencement of this suit."

Daniels et al. *v.* Barney; Same *v.* Wells.

The following was the reply:

"The plaintiff, for reply to the answer of the defendants, says that the bond mentioned in the complaint was given as a guaranty to the plaintiff, among other things, that the defendant, *Henry W.*, would faithfully account to the plaintiff for all moneys that should come into his hands for the use of the plaintiff in the course of his employment in said business.

"And the plaintiff further says that the several sums of money alleged in the complaint to have been received by said *Henry W. Daniels* for the use of the plaintiff, were received by him in the course of his employment for the use of the plaintiff, from those persons for whom the plaintiff had carried packages of goods, merchandise, parcels of bank notes, coin, and other articles of value, as a common carrier; and that he has failed to account for the same as alleged in the complaint."

A demurrer to this reply was overruled and the plaintiff had judgment.

The bond sued on was not taken, so far as appears, pursuant to any statute; but bonds of indemnity for the performance of legal acts may be good at common law. See *Byres.* v. *The State,* 20 Ind. p. 49.

Was the bond in question one of that character? If, by the contract of agency between the Express company and *Daniels,* he was to perform for the company only legal acts, the bond to secure the faithful performance of such acts was a legal one.

If, on the contrary, the contract of agency between the parties mentioned was for the performance of illegal acts; as if it was agreed between them, at the making of the contract, that they would carry on the express business without complying with the statute, set out in the opinion, and the bond was executed upon that contract, the bond was void in its

inception. Says *Story*, in his work on Agency, section 195: "Nay, the principle is carried further; and if the main object for which the agent is employed is legal, yet if, by the terms of the contract, and as a part of it, the agent is to act in an illegal character or manner in another part of the transaction, the whole contract will be contaminated thereby, and the agent can recover no compensation even for his legal acts under the contract. Neither can the principal enforce any of its obligations." It is not necessary that we should extend the consequences of illegality, in this case, so far as the extract from *Mr. Story* carries it.

If there was no such agreement as above described, but the bond was given upon a contract of agency in the performance of legal acts only, then the company had no right to require the agent to perform illegal acts, and the bond would not extend to anything connected with such acts, because they were not covered by the bond. See Story on Agency, § 344, *et seq.*

The reply of the plaintiff in the case, taken in connection with the answer, shows, with reasonable certainty, that all the money received by the agent, *Daniels*, was received as compensation for the performance by him, for the Express company, of illegal acts, viz: the transportation of packages, &c.

And the plaintiff, to support a right to recovery, falls back upon this proposition of law, viz: that "if money due to a principal on an illegal transaction should be paid over to his agent for him by the party from whom it is due, it has been held that the principal may recover it from the agent; for the contract of the agent to pay the money to his principal is not immediately connected with the illegal transaction; but it grows out of the receipt of the money for the use of his principal." 5th ed., Story on Agency, § 347; See, also, Chit. on Cont., 9th ed., p. 620; Dunlap's Paley on Ag., p. 62;

Add. on Cont., p. 648; 11 Wheat. 258; 11 How. 493; 16 M. & W. 185; 39 Barb. 140; 10 Ind. 109; 4 id. 8; 12 id. 199.

This proposition of law we admit, at least, in cases where the agent has not been concerned, by the order of the principal, in the execution of the illegal transaction, so far as it applies to the agent himself. It may be that if this suit had been brought against the agent himself, upon an implied assumpsit to pay over money received to the use of his principal, it would have rested upon a principle free from doubt. But this is not such a suit. This is a suit upon the bond of the agent, and against his sureties therein; and the question is, what acts of the agent are covered by that bond? If it was executed to cover illegal as well as legal acts, the bond was void ab initio. Story on Agency, § 195; Chit. on Cont., 7th Am. ed., 677 et seq., and notes; Anderson v. Farris, 7 Blackf. 343. The bond, by its terms, embraced all acts in the scope of the Express business; and it would seem that all parties were bound to know the law, and that the notice required by statute to render the business legal had not been given at the execution of the bond; and if it was then understood by the parties that the notice was not to be given, and the business prosecuted without, the bond was illegal, as we have said, in its execution. But, on the other hand, if the bond was executed to cover only legally conducted business transactions, then, the illegal acts participated in by the agent, by the direction of the principal, through which the money in question came to the hands of the agent, were not covered by the bond, and the principal has nothing to look to but the individual liability of the agent. These transactions could not be covered by the bond in parts, and not in parts. They were under the bonds as entireties or not at all. We think there can be no doubt about this. In any view of the case, therefore, we think no suit can be maintained on the bond in

question. See *Dedham Bank* v. *Chickering,* 4 Pick. (Mass.) Rep. 314.

*Per Curiam.*—The judgment is reversed, with costs. Cause remanded, &c.

*McDonald & Porter,* and *McDonald & Roache,* for the appellants.[1]

*L. Barbour* and *J. D. Howland,* for the appellees.[2]

(1) Counsel for the appellants argue:

In 1855, before the execution of the bonds upon which these suits were brought, the legislature passed an act, yet in force, concerning Express companies, which provides that all persons, associations of persons, or companies, usually called Express companies, regularly engaged, or thereafter to be engaged in the business of carrying or transporting packages or parcels of bank notes, coin, merchandise, or other articles, over or upon any of the railroads, &c., in this State, and receiving or agreeing to receive compensation for such services, shall be and are thereby declared common carriers, &c., and shall file in the recorder's office of each county in which their business is conducted, or where they have an agency or office, a statement showing the full name of every such person and member of every such association or company, and also his or her proper place of residence, and the amount of capital employed in such business; also an agreement that legal process served upon any agent of said person or persons, association, or company, in such county shall be deemed and taken as good service upon such person or persons, association, or company; and it shall be the duty of the recorder to make a record of the same, and also to publish, &c., a full and complete copy; that the statement shall be signed by the persons and members of such associations or companies, and verified by oath, &c.; that until such notice shall be given it *"shall not be lawful"* for any such person, association, or company, to *"transact the business"* above named; and any person, member of any association, or company, or *"any agent thereof,"* violating the provisions of the act, shall, for every such offence, be guilty of misdemeanor, and upon conviction shall be fined not less than 10 nor more than 100 dollars. 1 Gav. & Hord's Stats., 327.

Daniels et al. *v.* Barney; Same *v.* Wells.

It will be observed that besides the denunciation of a penalty against the company for doing business before the filing and publication of the statement required by the statute, the statute expressly makes the transaction of the business itself unlawful.

In this case the Express company were transacting business in direct violation and in defiance of the statute. They had employed the defendant *Daniels* to assist them in doing what the law had forbidden. Their business was to transport merchandise, &c., for hire; but they had no right to transport the merchandise, or receive the hire, until they had filed and published the statement required by law. Either was alike unlawful. His duties to secure performance of which the bond was given, were strictly limited to those of an Express agent— he had none beside. No part of these duties could be lawfully performed by him. To employ him was to increase the capacity of the company to do what the law had forbidden; the exaction of a bond with surety was not only designed to quicken his diligence in doing this, but also more certainly to secure the company the rewards of an illegal undertaking. If it was unlawful for the company to receive hire, and *Daniels* received it as their agent, then the parties being *in pari delicto, potior est conditio defendentis.* Nor can the circumstance that he gave a bond make any difference. *Collins* v. *Blantern*, 2 Wils. 341.

The rule which governs this case is a familiar one. "Where a contract or deed is made for an illegal purpose, a defendant against whom it is sought to be enforced may show the turpitude of both himself and the plaintiff, and a court of justice will decline its aid to enforce a contract thus wrongfully entered into. An unlawful agreement, it has been said, can convey no rights in any Court to either party; and will not be enforced at law or equity in favor of one against the other of two persons equally culpable." Broom's Legal Max. 578 (marginal paging.)

The rule is illustrated in the memorable words of Lord *Mansfield* in *Holman* v. *Johnson*, Cowp. 343. "The objection," says he, "that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed, but it is founded

in general principles of policy, which the defendant has the advantage of, contrary to the real justice as between him and the plaintiff—by accident, if I may so say.  *  *  *    No Court will lend its aid to a man who founds his cause, of action upon an immoral or illegal act.   If from the plaintiff's own stating or otherwise, the cause of action appear to arise *ex turpi causa*, or the transgression of a positive law of his country, there the Court says he has no right to be assisted.   It is upon that ground that the Court goes, not for the sake of the defendant, but because they will not lend their aid to such a plaintiff.   So, if the plaintiff and defendant were to change sides, and the defendant were to bring his action against the plaintiff, the latter would then have the advantage of it, for where both are equally in fault, *potior est conditio defendentis.*"

To apply this reasoning of Lord *Mansfield* to the cases at bar, suppose *Henry W. Daniels* had sued the plaintiff on these bonds for his services, or had sued on a *quantum meruit* for said services, could there be a doubt that the illegality of the contract and services would have defeated his action?

In 1 Parsons on Cont. 382, the author remarks:  "Where the consideration is altogether illegal, it is insufficient to sustain a promise, and the agreement is wholly void.   This is so equally, whether the law which is violated be statute law or common law.   It has been held in England that where a statute provided a penalty for an act, without prohibiting the act in express terms, there the penalty was the only legal consequence of a violation of the law, and a contract which implied or required such violation was nevertheless valid.   But Lord *Holt* denied the doctrine, and Sir *James Mansfield* established a better rule of law, holding that where a statute provides a penalty for an act, this is a prohibition of the act.   We apprehend that this has always been the prevailing if not the uncontradicted law in this country."   A multitude of cases is cited, fully supporting the text. Lord *Holt* in the case of *Bartlett* v. *Vinor*, Skin. 322, says:  "Every contract made *for or about* any matter or thing which is prohibited or made unlawful by any statute, is a void contract though the statute itself does not mention that it shall be so, but only inflicts a penalty on the offender, because a penalty implies a prohibition, though there

are no prohibitory words in the statute." In the case at bar, however, as we have heretofore shown, not only are the transactions declared penal, but expressly unlawful.

The case of *The State* v. *The State Bank*, 5 Ind. 353, is much in point. An act of the legislature had provided that the school commissioner should, on taking a mortgage, loan to the applicant any sum not exceeding half the appraised value of the land; but a greater amount than 300 dollars should not be on loan to any one applicant at a time. A mortgage given to secure a loan of more than 300 dollars to a single applicant was held to be void, as being an illegal contract in contravention of the statute. And the words of Lord *Mansfield* above quoted are cited by the Court with approbation. The words of that statute are certainly not sterner than those which prohibit Express companies from transacting business prior to a compliance with its provisions.

Several cases were cited by counsel for the plaintiff to support the validity of the bond; but it is believed that a thoughtful reading will show them to be in our favor. We will proceed to discuss them.

The first is *Randon* v. *Toby*, 11 How. (U. S.) 493. In a suit upon notes, there was a plea that the notes were given for *African* negroes imported into *Texas* after 1833; and the argument in support of it was that the notes were void, because the introduction of *African* negroes both into *Cuba* and *Texas*, was contrary to law. "But," the Supreme Court say, "in neither point of view will these facts constitute a defence in the present case. If these notes had been given on a contract to do a thing forbidden by law, undoubtedly they would be void and the Court would give no remedy to the offending party, though both were *in pari delicto*. But *Toby* (the payee) or his agent *McKinney* had no connection with the person who introduced the negroes contrary to law. Neither of the parties in this case had anything to do with the original contract, nor was their contract made in defiance of law. The buying and selling of negroes in a State where slavery is tolerated, and where color is *prima facie* evidence that such is the *status* of the person, can not be said to be an illegal contract and void on that account." Here, then, the parties were both strangers to the illegal transaction connected with the negroes;

they had had nothing whatever to do with it. But, in the case at bar, both the plaintiff and the defendant, *Henry W. Daniels*, were parties to an illegal transaction, the one as employer and the other as employee, and the bond is directly connected with it.

The next case cited below by the plaintiff's counsel is *Armstrong* v. *Toler*, 11 Wheat. 258. The questions in the case arose upon instructions given by the Circuit Court, touching contracts founded upon an illegal consideration. The Court sustained instructions to the following effect: "That where the contract grows immediately out of an illegal act, a court of justice will not enforce it; but if the promise be unconnected with the illegal act and is founded on a new consideration, it is not tainted by the act, although it was known to the party to whom the promise was made and although he was the contriver and conductor of the illegal act. Thus if *A* should, during war, contrive a plan for importing goods from the country of the enemy on his own account, by means of smuggling or of a collusive capture, and goods should be sent in the same vessel for *B*, and *A* should upon the request of *B* become surety for the payment of the duties, or should undertake to become answerable for the expenses on account of a prosecution for illegal importation, or should advance money to *B* to enable him to pay those expenses; these acts constituting no part of the original scheme, here would be a new contract upon a valid and legal consideration, unconnected with the original act, although remotely caused by it, and such a contract would not be so contaminated by the turpitude of the offensive act as to turn *A* out of Court when seeking to enforce it; although the illegal introduction of the goods into the country was the consequence of the scheme projected by *A* in relation to his own goods." The reasoning of the Supreme Court in favor of the instruction is this: "The case does not suppose *A* to be concerned, or in any manner instrumental in promoting the illegal importation of *B.*" He was a stranger to *B*'s illegal act. To pay the duties was legal, and as *A* was not connected with *B*'s transaction except in becoming *B*'s surety, after the arrival of the goods, for the payment of the duties, and in afterwards paying them, his right to recover from *B* the amount so paid was clear. And the Supreme Court further add, in justification of the charge, that "it is laid down

with great clearness that, if the importation was the result of a scheme between the plaintiff and defendant, or if the plaintiff had any interest in the goods, or if they were consigned to him with his privity, that he might protect and defend them for the owner, a bond or promise given to repay any advances made in pursuance of such understanding or agreement would be utterly void.' The Court, then, criticising the argument for the plaintiff in error, add that, "in most of the cases cited by the counsel for him, the suit has been brought by a party to the original transaction, or on a contract so connected with it as to be inseparable from it," referring to the cases, and they add in approval of them, that "in these and all similar cases, the consideration of the very contract on which the suit is brought is vicious and the plaintiff has contributed to the illegal transaction." The argument is altogether in our favor. The Express company is a party to "the original transaction" of transporting merchandise and receiving hire therefor, without complying with the statute, and the bond of *Daniels*, obliging him to aid in this unlawful business, is so "connected with the original transaction as to be inseparable from it."

The next and last case cited by the plaintiff's counsel is the *Dedham Bank* v. *Chickering and Others*, 4 Pick. 314. The facts, so far as applicable to the present case, were as follows: *Chickering* had been cashier of the *Dedham Bank*, and before entering upon his office had given a bond, with the other defendants as sureties, for the faithful performance of his official duties, &c. The bank, prior to 1816, had authority to issue circulating bills payable at other places than its counter, but in 1816 the legislature had enacted that no bank should issue bills payable at any other place than the bank, unless the bills should also on their face be payable at the bank; that every bank which should issue any such bills should be liable to pay the same at the bank, without a previous demand elsewhere; and that if the bank should refuse to pay the same on demand, it should be liable to pay the holder after the rate of 2 per cent. a month as additional damages. Bills of the *Dedham Bank* to the amount of 24,476 dollars, payable at the *Middletown Bank*, had been issued, and having been redeemed by the latter bank, had been transmitted and delivered

by it to *Chickering* as cashier, for the whole of which amount, by the direction of *Chickering*, he had credited on the books of the *Dedham Bank.* But *Chickering*, in fact, only returned to the *Dedham Bank* 15,000 dollars of the bills thus transmitted to him, and surreptitiously reissued, for his own benefit, the remaining 12,746 dollars, for which amount judgment was sought against the defendants. The defendants set up, by way of defence that the delinquency of *Chickering* grew out of an illicit transaction on the part of the directors and cashier of the *Dedham Bank*, the issuing and circulating of bills of this description being expressly prohibited by the statute already cited. In delivering the opinion of the Court, the judge, at the outset, says, that it ought to have been made to appear that the bills thus embezzled were issued after the passage of the statute, it not having been before unlawful for a bank to issue bills payable at any other place than their own bank; and that it was not for the Court, without evidence, to say that the bills were not issued before *December* 13, 1816, which was the day of the enactment of the statute. This statement alone disposed of the case, and the Court's subsequent remarks might properly be regarded *obiter dicta.* But not choosing to rest the decision solely on that ground, it put it also upon another ground, viz: that though it was unlawful to issue such bills after the passage of the statute, yet the bills were not made void thereby, but, on the contrary, had a force expressly given to them beyond their mere *terms.* Though not by their face, yet by the terms of the statute, they were made payable at the place whence they issued, and a refusal to pay on demand entitled the holder to four times the usual amount of interest. When taken up at the bank at *Middletown* by the funds of the *Dedham Bank*, they became the property of the latter. "It was not unlawful," therefore, say the Court, "to recive them back into the bank after they had been in circulation." "It was the proper duty of the cashier so to receive them, and having received them, if he reissued them without the knowledge of the directors, or in any way converted them to his own use, he committed a breach of trust." "We think," adds the judge, "this transaction wholly disconnected from the illegality of the issuing the bills, and that such illegality affords no manner of excuse to *Chickering* for purloining them, or of defence

Daniels et al. *v.* Barney; Same *v.* Wells.

.to his sureties. Had the charge been that he had neglected his duty in issuing these bills, * * the illegality of the intention to issue might have been a defence."

This Court will observe that *Chickering* was not connected by the evidence with the original transaction of issuing these bills; that, by the statute, they were not void; that when redeemed the bank had a right to their return for cancellation; that the cashier having received them after redemption, it was his duty to return them, and that not returning them, and reissuing them, was a breach of duty.

But, in the case at bar, the plaintiff and *Henry W. Daniels* were both connected with the original unlawful transaction, and, moreover, it being unlawful to receive hire for transportation, it could not be the legal duty of *Daniels*, having received it, to pay it over. *Potior est conditio possidentis.*

We understand that the appellee further relies on the case of *Murray* v. *Vanderbilt*, not yet published, but a note of which appears in The American Law Register for *October*, 1863, pp. 765, 766. This very brief statement of the case is unsatisfactory; it embodies few of the facts and none of the reasoning of the Court. It shows enough, however, to render that case clearly distinguishable from the case at bar. It is evidently distinguishable in two important particulars:

1. In that case, the illegality of the original contract, if any, was not by a prohibitory statute forbidding the contract and making it penal, but by a rule of public policy. On this we do not, indeed, very much rely. We mention it, however, as worthy of consideration.

2. In the case of *Murray* v. *Vanderbilt*, the action was not on any original contract to do an unlawful act, but against an agent who had received money for the plaintiff which had been paid to him voluntarily by one of the parties to the original unlawful contract. The note of the case states that it was "*Held*, that in action brought by the *Transit Co.* against the *Pacific Co.* (the parties to the unlawful contract) * * * the Court would not enforce it against the delinquent party." The case seems to have been simply this: By an illegal contract, *A* agreed to pay *B* a sum of money. The agent of *B*,

who had no connection with the illegal contract, received this money for *B* from *A*, who voluntarily paid it. The agent refused to pay it to his principal, *B*. And the Court held that the agent, in a suit against him by *B*, could not defend on the ground of the illegal contract between *A* and *B*. This was, perhaps, right; but right or wrong, it evidently is wholly unlike the case at bar.

In the case of *Murray* v. *Vanderbilt*, and in all the cases cited by the appellees, there is this broad, plain distinction, as compared with the present action: All those cases were, to say the most, but collateral to, or remotely connected with, the original illegal contract; but here the action is plainly an action upon the original unlawful agreement. If the suit had been upon an implied assumpsit against the principal, *Henry W. Daniels*, alone, to recover the money he had received as the agent of the plaintiff, there might have been some analogy between such a case, and those cases cited by the appellee. But here the suit is upon the original illegal contract—the bond, and it alone—by which the appellants engaged to do an illegal act. The whole consideration of this bond, on which they are sued, is utterly unlawful. And we confidently assert that no respectable modern authority can be found which will justify a recovery on such a bond.

And the objection to such a recovery is, if possible, still stronger, when we consider that the action is against two sureties, who must pay the money if the suit be sustained, and especially when we consider that the answer shows, and the fact is admitted by the reply, that the appellants "were ignorant till the time of the commencement of this suit," of the facts rendering said bond illegal.

And here we would remark that, though we have thus far argued this case as if the parties to the bond were all *in pari delicto*, yet the admitted allegation in the answer that the appellants were "ignorant" of the facts rendering the bond illegal, shows that they were not *in pari delicto* with the appellant, but wholly innocent. And, as the appellant, the president of the Express companies, must be presumed to have known the facts of which the appellants were thus ignorant, he alone was *in delicto*. And in this view of the case, we submit that the contract is not only void for illegality, but is also invalid because of a fraud perpetrated by him on them in seducing them into

Daniels et al. *v.* Barney; Same *v.* Wells.

a contract which it must be presumed they would not have made, if they had been aware that it was illegal. For every man is presumed to keep the law till the contrary is shown.

(2) Counsel for the appellees argue:

Waiving other considerations that were urged in the Circuit Court, we propose to show the law to be that an agent to whom money is paid on behalf of his principal, can not refuse to account to his principal on the ground that it accrued upon an illegal contract. We hope to place this proposition beyond doubt, by a pretty full citation of the authorities.

Chitty on Contracts, 9th ed., p. 620: "A principal who has lodged money in his agent's hands for an illegal purpose, may, before the money is so applied, countermand the agent's authority, and recover it back as for money had and received to his use. It seems that an agent who receives money for his principal, can not resist an action by the latter for the amount as received to his use, on the ground that the money was paid to the agent by a third party under an illegal contract between the latter and the plaintiff."

No elementary writer employs stronger language than does Judge *Story*, against illegal contracts. Yet he is compelled to concede the law to be, that "if money due to a principal on an illegal transaction should be paid over to his agent for him by the party from whom it is due, it has been held that the principal may recover it from the agent; for the contract of the agent to pay the money to his principal is not immediately connected with the illegal transaction; but it grows out of the receipt of the money for the use of his principal." 5th ed. Story on Agency, § 347.

Dunlap's Paley on Agency, 62, is equally explicit: "If money have been actually paid to an agent for the use of his principal, the legality of the transaction, of which it is the fruit, does not affect the right of the principal to recover it out of the agent's hands. For though the law would not have assisted the principal, by enforcing the recovery of it from the party by whom it was paid, because it is not the policy of the law to aid the completion of an illegal contract, yet when that contract is at an end, the agent, whose liability arises solely from the fact of having received money to another's use, can

have no pretence to retain it. This doctrine was recognized by the Court of Common Pleas in a case where a broker, having effected an insurance upon a ship engaged in a trade to the *East Indies*, contrary to the 7th Geo. I, and having received the loss from the underwriters, refused to pay it over to his employer, alleging the illegality of the transaction as a defence to the action for money had and received to his use. . The plaintiff, however, had a verdict; and the Court, upon a motion for a new trial, thought the verdict right. And in a subsequent case, where the defendants had received money for the plaintiff, *as the price of counterfeit coin*, which they had been employed to carry and procure payment for from the parties who purchased it, it was held that the illegality of the transaction furnished no defence to them, in an action for money had and received. And, in both these cases, the Court considered the original transaction as forming no part of the implied contract arising from the receipt of the money, which formed the ground of the action."

The same author, at page 10, declares it is an established principle that an agent can not make himself an adverse party to his principal; and in note *k*, to the same page, it is said: "In general an agent can not deny the title of his principal to the subject matter of the agency, or protect himself in a suit by the principal by setting up an adverse title in a third person."

Addison on Contracts, 648: "The Courts will not try the right of the principal to the money in an action against the agent."

Indeed it would be difficult to state the law more clearly in accordance with these principles than has been done by Judge *McDonald*, the counsel who is now arguing against us. "It is only when the contract grows immediately out of, and is connected with an illegal or immoral act, that a Court of justice will lend its aid to enforce it. But if the promise is unconnected with the illegal act, and is founded on a new consideration, it is binding, although the plaintiff knew, and was the contriver and conductor of the illegal act. Thus if you are indebted to *J S* on a contract forbidden and unlawful, and you pay the money to *C*, for the use of *J S*, and *C* refuse, contrary to his implied contract, to pay the money to *J S*, the law will make him do it. In this case *J S* could not have recovered against you; but when the

money came to *C* a new promise was raised. Besides, the law will not permit a third person, who is only incidentally connected with the transaction, to set up illegality in the contract between the principal parties, and thus commit a fraud." McDonald's Treatise, 385.

Nothwithstanding the criticisms of counsel, we insist that the case of *Armstrong* v. *Toler*, 11 Wheat. 258, is directly in point. This is shown by the fact that in it are discussed all the leading cases involving the principle we have to examine. We submit some extracts from the opinion of Chief Justice *Marshall:*

"Questions upon illegal contracts have arisen often, both in *England* and in this country; and no principle is better settled than that no action can be maintained upon a contract, the consideration of which is either wicked in itself, or prohibited by law. How far this principle is to affect subsequent or collateral contracts, the direct and immediate consideration of which is not immoral or illegal, is a question of considerable intricacy, on which many controversies have arisen, and many decisions have been made. In *Faikney* v. *Reynous,* 4 Burr. 2069, the plaintiff and one *Richardson* were jointly concerned in certain contracts prohibited by law, on which a loss was sustained. the whole of which was paid by the plaintiff; and a bond was given for the securing the repayment of *Richardson's* proportion of the loss. To a suit on this bond the defendant pleaded the statute prohibiting the original transaction, but the Court held on demurrer that the plaintiff was entitled to recover. Although this was a case upon a bond, the judgment does not appear to have turned on that circumstance. Lord *Mansfield* gave his opinion on the general ground that if one person apply to another to pay his debt, (whether contracted on the score of usury or for any other purpose,) he is entitled to recover it back again. This is a strong case to show that a subsequent contract, not stipulating a prohibited act, although for money advanced in an unlawful transaction, may be sustained in a Court of justice. In a subsequent case (6 Term Rep. 410,) *Ashhurst J.* said the defendants were held liable because they had voluntarily given another security."

"In the case of *Petrie* v. *Hannay*, 3 Term Rep. 418, the testator of the plaintiffs was engaged with the defendant in stock transactions

which were forbidden by law, on which considerable losses had been sustained, which were paid by *Portis*, their broker. *Keeble* repaid the broker the whole sum advanced by him, except £84, which was in part the defendant's share of the loss, for which *Keeble* drew a bill on the defendant, which was accepted. The bill not being paid, a suit was brought upon it by *Portis* against the executors of *Keeble*, and judgment obtained, they not setting up the illegal consideration. The executors brought this action to recover the money they had paid, and it was held by three judges against one, on the authority of *Faikney* v. *Reynous*, that the plaintiffs could maintain their action. A distinction was taken in cases where money was paid by one person for another, on an illegal transaction, by which the parties were not bound; between a voluntary payment and one made on the request of a party; between an assumpsit raised by operation of law, and an express assumpsit. Although the former would not support an action, the latter would."

"This, also, is a strong case to show that a new contract, by which money is advanced at the request of another, or which is the same thing, where there is an express promise to pay, may sustain an action, although the money was advanced to satisfy an illegal claim." "In *Farmer* v. *Russel*, 1 Bos. & Pul. 296, it was held that if *A* is indebted to *B* on a contract forbidden by law, and pays the money to *C* for the use of *B*, a Court will give judgment in favor of *B* against *C* for this money. In this case *B* could not have recovered against *A*; but when the money came into the hands of *C* a new promise was raised on a new consideration, which was not infected by the vice of the original contract. In this case Chief Justice *Eyre* said that the plaintiff's demand arose simply from the circumstance that the money was put into *C's* hands for his use; and Justice *Buller* said that the action did not arise upon the ground of the illegal contract. Yet, in this case, *A's* original title to the money was founded on an unlawful contract, and he could not have maintained an action against *B*."

"The general proposition stated by Lord *Mansfield*, in *Faikney* v. *Reynous*, that if a person pay the debt of another at his request an action may be sustained to recover the money, although the original contract was unlawful, goes far in deciding the question now before

Daniels et al. *v.* Barney; Same *v.* Wells.

the Court. That the person who paid the money knew it was paid in discharge of a debt not recoverable at law, has never been held to alter the case. A subsequent express promise is undoubtedly equivalent to a previous request.

In *Randon* v. *Toby*, 11 Howard 493, this language is used by Justice *Grier :*

"If the defendant should be sued for his tailor's bill, and come into Court with the clothes on his back, and plead that he was not bound to pay for them because the importer had smuggled the cloth, he would present a case of equal merits, and parallel with the present; but would not be likely to have the verdict of the jury or the judgment of the Court in his favor."

*Cummings* v. *Henry*, 10 Ind. 109, decides that a contract for the sale of property for gaming, or, indeed, to be used in any way in violation of statute, is not void; and that the vendor, although knowing the intended use of the property, may recover its value. The case of *Toler* v. *Armstrong*, above referred to, is cited with approval.

We call special attention to the case of *Bousfield* v. *Wilson*, 16 Meeson & Welsby, 185. These are Exchequer reports, and of the highest rank and value of any modern *English* reports. The defendant, as agent of the plaintiff, had sold fifteen shares of stock in a railway company, which had not been registered in accordance with an act of Parliament. The suit was brought by the principal to recover of his agent the money received on the sale of these shares of stock. The defence was that the sale was in violation of the act of Parliament, and that no recovery could be had. The Court absolutely ridiculed the defence.

The case of the *Dedham Bank* v. *Chickering*, 4 Pick. 314, is one upon which we may very well rely. The Bank issued its bills payable at a distant point, and, if they had been issued after the passage of a certain act of the Legislature of *Massachusetts*, the issue was illegal. The Court speak of the case in this aspect. They consider what the rule is, supposing the bills to have been originally circulated in fraud of the statute. The cashier, who certainly was the agent of the bank in its financial operations, and must have signed these unlawful bills, and so have participated in the unlawful act, was

the depositary who received them into his custody. The receiving them was not unlawful, say the Court: "It was the proper duty of the cashier so to receive them; and having received them, if he re-issued them, without the knowledge of the Directors, or in any way converted them to his own use, he committed a breach of official trust. On these bills, however unlawfully issued, the bank was liable, and without doubt has since been compelled to redeem them. We think this transaction wholly disconnected from the illegality of issuing the bills, and that such illegality affords no manner of excuse to *Chickering* for purloining them, or of defence to his sureties. Had the charge against *Chickering* been that he had neglected his duty in issuing these bills, or that he had destroyed them because intended to be issued contrary to law, the illegality of the intention to issue might have been a defence. But he is charged with having received them, after they had been in circulation, and been collected in *Middletown* to be returned to the bank by which they were issued, and, instead of placing them in the vaults, from whence it can not appear they would ever have been again issued, putting them in circulation himself, or otherwise converting them to his own use. There seems to be nothing illegal in the transaction, so far as we can see into it, except in the conduct of *Chickering.*" *Id.* 336, *et seq.*

But, say counsel, it does not appear that *Chickering* was connected with the original illegal act—the issuing of these bills; and so they would distinguish that case from this. *Chickering* was the cashier, the active business agent of the bank, signing its bills, and by the very character and functions of his office, superintending the circulation of its paper. If the logic of counsel is applied to the bank and its cashier, as they apply it to the Express company and its agent, it is plain that the doctrine of *par delictum* comes home to the former as completely as it does to the latter. An unlawful act was committed by the officers of the bank, of whom the cashier was one; he participated in that offence: that act was remotely the means of putting these bills into his hand, and enabling him to purloin and circulate them. But the Court was unable to see that because there had once been a joint illegal act participated in by the bank and its agent, it

Daniels et al. *v.* Barney; Same *v.* Wells.

gave the latter a perpetual right to steal from the principal the fruits of their original sin.

The case of *Murray* v. *Vanderbilt* will be at the command of the Court, in 39 Barbour, N. Y. R., before this case is examined by them. The statement in the American Law Register is as follows:

"An agreement was made between the Pacific Mail Steamship Company and the Accessory Transit Company, by which the former company was to pay the latter a certain sum per trip, or per month, so long as the boats of the Pacific company should run without opposition. *Held*, that in an action brought by the Transit company against the Pacific company, although the contract was immoral and in restraint of trade and commerce, and the Court could not enforce it against the delinquent party, or, if the money had been paid, enable the party paying to recover it back, but would leave the parties where the law found them, both being in *pari delicto*, yet that the rule did not apply to an action by one of the principals in such a contract against the agent who had received the money thereon."

"Money being paid voluntarily to an agent, for his principal, by a party who could not be compelled to make such payment, it becomes the property of the principal in his agent's hands, for which he should account. He has no right to refuse payment to his principal because the latter had not a legal right to the money paid."

"An agent has no right to dispute the title of his principal to moneys received by him for the use of his principal. Nor can he resist an action for the amount so received, on the ground that the money was paid on an illegal contract between the original parties."

The observations of counsel upon these cases, in their effort to distinguish them from the one in hand, are ingenious but unsound. The doctrine of *par delictum* is applied to the principal parties in the contract. To either of them, on his obtaining any advantage over the other, the Court say: "You are both guilty, and we do not aid either; *melior est conditio possidentis*." But where is the authority by which it can be shown that an agent of such a contracting party has been shielded in this way? The counsel have found none. It is safe to assert that no such authority exists. The agent of one engaged in an unlawful business is himself necessarily engaged in an

unlawful business. The agent who signs and circulates illegal bank notes is as guilty as the president and directors of the bank. The agent whose duty it is, as in the case of the steamship companies, to receive for his principal the money paid to defeat competition, is quite as guilty of violating the law as the principal himself. The agent who carries counterfeit coin and receives the pay for it, is as guilty as the principal who entrusted him with it. In short, these cases, and the rules deduced from them by the elementary writers, proceed upon the notion that the agent of a person engaged in an illegal traffic is his agent in that very business. Where do you find the distinction made that gentlemen assert here? It would thus in substance appear in the books: "The general rule is that an agent can not refuse to pay over to his principal money received by him, on the ground that it was paid on an illegal contract; but this rule is to be understood with this qualification, that the agent is to be one who acts in some capacity for his principal wholly disconnected with the illegal contract. If the agent is involved in the guilt of his principal he may keep the money, for the reason that he is in *pari delicto* with him, and may insist on the consequence of that relation—*melior est conditio possidentis.*" But there is no such qualification anywhere made to the liability of an agent to account to his principal.

The law proceeds on another ground. Money in the hands of an agent is the money of his principal. The agent is in law estopped to deny his principal's title; just as a tenant is estopped to deny that of his landlord. Have we ever heard that a tenant who had aided his landlord in some illegal act by which the title to the land had been acquired, could hold the possession against his landlord? The law is founded upon a purer morality than this. It is of highest concern that these relations of confidence shall not be violated. The law will have a certain degree of "honor among thieves." It will not allow the agent to steal from his principal because his principal stole from another; nor does it any the more protect the defaulting agent because he has the shamelessness to say that he helped to commit the theft of which he accuses his master.

It is urged, however, that the bond sued on was an illegal contract, within the prohibition of the statute, and that the suit must fall, on

the ground that the agent can not be required to respond to his principal, if the recovery can only be had through the medium of an illegal contract.

The act of 1855, in the latter clause of section 2, declares: "Until such notice be given, it shall not be lawful for any person, association or company to transact the business named in the first section of this act," &c. Thus a particular class of acts is made unlawful. What is it? Refer to the first section, and it will be found to prohibit the "carrying and transporting" of goods, and nothing else. This alone is unlawful. It is not unlawful for an Express company to hire a house, buy furniture, safes, horses, wagons, and other usual equipments for the commencement of its business. It would hardly be insisted that one who had sold to an Express company any such things upon credit, must lose the debt, because the contract was unlawful. All these things are incidental and collateral to the main business, which is to transport packages from place to place for hire. So the company, in the institution of its business, may employ agents, contract for their wages, define their duties, and exact bond and security for their performance. None of these things are prohibited. They are necessary and lawful steps to be taken by a company proposing to do a lawful business. It is not pretended that when the bond was made it was the intent of the parties to violate the statute. The bond was then one of those things the company might well require of its agents in making its preparations to pursue its business in exact conformity with the law. It can make no difference that a statement such as the law requires had not then been filed. Suppose the bond made one day and the statement filed the next; does this avoid the bond? Surely no such consequence can follow. The making of the bond and the filing the statement are each merely incidents to the organization of the business, and the order in which they may happen to stand each to the other is a thing quite indifferent. The bond, lawful when made, is not capable of being rendered unlawful by relation. It is not affected by the subsequent illegal acts of the company.

The counsel rather show their eagerness to succeed, than their confidence in this appeal, when they present to this Court the considera-