Freeman, J.,
delivered the opinion of the Court.
The bill in this ease was filed by Pointer to recover the hire for 1864 of certain negroes, alleged to have been received by Smith as agent in charge of said negroes in the State of Alabama, and invested in cotton.
The facts necessary to be stated, in order to raise the questions presented for our decision, are, .that in 1863 the negroes of Pointer had been hired to Noble and Bro. in Alabama for that year, and that in February, 1864, they came into possession of Smith, who undertook their control and management, in pursuance of a letter written by Pointer to said Smith, dated January 27th, 1864. There is some controversy as to whether Smith had taken charge of. the negroes of *139 his own accord before receiving this letter, but ' on careful examination of the testimony and all the circumstances developed in the case, we feel no hesitancy in coming to the conclusion that the negroes were taken charge of in pursuance of the request contained in this letter.
This letter was written while Pointer was within the Federal lines of occupation, at his home in Williamson county; and sent through the lines by one George B. Hunter.
There is some discrepancy in the proof as to the date of the sending, but the letter is proven by Hunter to be the one exhibited in the record as “Ex. A,” and is of the date above stated.
From that letter it appears, as is shown elsewhere, that Pointer had been informed that Smith had become a member of the firm, as he expresses it, of Noble, Bro. & Co., and as the negroes were in their employ at their furnace, Pointer expressed himself as much gratified at the fact, as Smith was his “ friend and neighbor,” and his negroes would be in safe hands. He then says, “I place my negroes in your hands with the utmost confidence that you will do for me what you do for others — that is all I ask. Watch the movements, and run my negroes; hire them out, sell them, and invest in cotton or anything else, as your discretion may dictate, for I would not give nine dollars a dozen for all the negroes in Tennessee as they are.”
He then goes on to give some advice to the ne-groes themselves by way of preventing a desire on *140 their part to run away; and tells Smith to give them “ whatever they want in reason, and charge all extras to me.” He says, “I do not want my negroes sold except in an extreme case,” hut advises they be run whenever necessary, and all expenses and travel charged to him, and “I shall only expect you to give me the same hire you give others; in other words, what you think is right.”
Smith got the negroes from Noble Bros., by the assistance of Capt. Ed. Pointer, a nephew of complainant, and hired them to Claybough & Co., at Talledega, Alabama, about last of February or early in March, 1864, for the sum of $4,500, the hirers to pay for clothing, etc., or clothe them; but afterwards, owing perhaps to failure of Claybough & Co. to clothe them, it was agreed they should pay $3,000, or about this sum, for this purpose, to Smith, and he should clothe them.
Smith, in his answer to the original bill, admits that he received enough Confederate money from Clay-bough. & Co. under this agreement “to cover the shoe and clothing bill for the negroes,” but denies that he ever received anything else from Claybough & Co. for the Pointer negroes; yet, in his answer to amended bill, after stating the agreement to pay the $3,000, he says he purchased clothing out of his own funds for said negroes, amounting to about $2,500, and that “Confederate money was of greater value at this time than ever after that;” and this after affirming by reference to them all the statements of his previous answer.
Two leading questions are presented in argument, *141 and raised by the record in this case, together with several minor ones, to which we may incidentally allude in this opinion. The first is one of law, the other of fact mainly.
The leading question of law presented is, that, as Pointer was a resident at the time of writing the letter referred to, within the Federal lines in Williamson county, Tennessee, and Smith, at the time within the Confederate lines, in the State of Alabama, though both citizens of the State of Tennessee; all communication or intercourse between the parties was illegal, contrary to the law of nations, and consequently the appointment of Smith as agent was void; and no liability to account for any money that might have been received for the hire of the .negroes can be had in any court; on account of this illegal element entering into the transaction.
We have given the question in this form considerable investigation, but in 'the view of the case we have taken, it is not necessary authoritatively to decide it. We may say however in passing, that it would be exceedingly difficult successfully to maintain the proposition, to the extent insisted on, as applica-cable to our late civil war; complicated as it was, by being a war of the Government of the United States, waged against a portion of the States, claimed to be part of, and subject to the sovereign rights of, the General Government, when taken in connection with the attitude or relation assumed by the United States by the act of Congress of 1861, and the proclamation of President Lincoln, in pursuance of the act of *142 Congress mentioned. The United States Government at first assumed belligerent attitude towards the States engaged, in insurrection, with all its consequences, forbidding all intercourse between the loyal States and States engaged in the rebellion, but expressly excepted from the operation of this rule such parts of. the in-surrectionary States as “from time to time should be occupied, and controlled by national forces engaged in the dispersion of the insurgents.” This clearly went on the principle, that the country thus occupied, had been restored to its normal condition, so far as trade and intercourse were concerned, by virtue of such occupation and control of the country by the national forces, and in this respect, it seems to us, changed the enemy relation existent before the occupation; and which was declared to exist by the proclamation, to that of friendship and amity. But afterwards this policy was changed, and by' the proclamation of March 31, 1863, it was assumed, “that experience had shown that the exceptions made in the former proclamation embarrassed the due enforcement of the act of 1861, for the suppression of the rebellion, and therefore the rule was changed, and Tennessee with other States declared in insurrection were excluded from the ben’efit of the exceptions in the first proclamation, certain exceptions being retained in favor of West Virginia, New Orleans, and several other places, then permanently occupied by the Federal forces; and all commercial intercourse was forbidden between the other parts of the United States, and these States, except under license as- provided by act of 1861, and such *143 intercourse so remained unlawful until the insurrection should be suppressed or cease, and notice thereof be given by proclamation of the President of the United States. Taking these two proclamations together, it seems to us that the last wiped out the exception of the enemy relation, which the Government of the United States had chosen to make between the insurgent States and the other States, and went on the principle that these States and their inhabitants were enemies until the insurrection should cease or be suppressed, and then that fact be announced by proclamation of the President.
In fact, the state of war was understood to exist by the Federal Government, de jure, if not as a matter of fact, till the proclamation of President Johnson announcing the fact of peace in June, 1865.
This being true, Tennessee in 1864 was but the, enemy’s country in occupation of the conqueror, and was subject only to such regulations as the conqueror might by the law of nations prescribe; that is, the, military commander could make such military regulations as military prudence might dictate, and enforce such enactments by military penalties inflicted by military tribunals, or at his discretion might organize and establish temporary civil machinery adapted to the circumstances and to meet the emergency, by which order might be enforced, and due subordination maintained among the people. In fact, the President of the. United States, as commander-in-chief of the army of the United States, and by virtue of the war power alone, did appoint a Military Governor for the State *144 on the principle stated, but the whole was military power, not civil government, based on assumed occupation of the enemy’s territory. In this view of the case, it is a serious question as to whether the people could be held as both enemies and friends to each belligerent party; for the rule of non-intercourse is based solely on the enemy relation; — that they should be forbidden commercial intercourse with either belligerent, by virtue of this rule, would be hard to maintain on sound principle.
We might advert to a number of other considerations in maintenance of these views, and support them by authority of decided cases; but we do not deem it called for by the case that we should definitely settle this question at present.
We think the view of this case which avoids this necessity is, that this bill is not for an enforcement by the one party, as against the other, of this contract, nor for damages for non-performance of it. In such case the illegality of the contract might well be interposed as a defense. The question is not the enforcement of the contract of agency, but whether a party who had acted as agent, whether legally appointed or otherwise, can claim, that he can keep the proceeds or hire of property confided to him as agent, and refuse to account for money thus received, on the grounds stated, of .illegality of intercourse between him and the owner of the property at the time he took charge of it.
The case of Brooks v. Martin, 2 Wal., 79, was a case where a partnership engaged in an illegal traf- *145 fie, buying up soldiers’ claims to land warrants or scrip, under the act of Congress of 1847.
The Court in that case hold, that while the traffic was illegal, and the soldier might have compelled the parties to restore possession of a warrant thus obtained, or if, after the contract between the parties, one of them had refused to proceed with the partnership because the purpose was illegal, the other partner would have been entirely without a remedy, or that either partner might have refused to comply with any stipulation of the partnership contract in furtherance of this illegal object, and no court would have given the others any remedy against him for such refusal; yet, the question of an account for funds received by a partner was a difficult question, and that it did not lie in the mouth of a partner, who had thus obtained funds, to refuse to do equity to his other partners because of the original illegality of their contract.
The principle thus laid down is sustained by numerous authorities, both English and American, and we think is sound and adopt it. (See authorities cited in above case.)
The complainant having the right to an account, the next question is of fact, as to whether any such hires as charged in the bill were received from Claybough & Co., in 1864, and if so, were they invested in cotton, as found by the Chancellor. It may be remarked here, that the letter to Smith from Pointer does not in terms direct that the hires of the negroes should be invested in cotton, but only that in an emergency, such as was contemplated as possible, *146 they should be sold, and the proceeds invested in cotton, or in any other way deemed best by Smith.
He was however directed to hire them out, and if he did so, and received the proceeds, and did in fact invest in cotton, he could clearly be held responsible for the cotton. It is charged in the bill that he received the whole amount of hire due from Claybough & Co., at intervals during the year 1864, and the bill says complainant will be able to establish this by proof, and fixes the sum at $7,500 so received. This, however, must include the amount of $3,000 agreed to be paid for the clothing, ms the negroes in fact hired for $4,500. Smith in his answer to the original and to the amended bill, acknowledges he received enough to cover the bills for clothing and shoes from Claybough & Co., but denies positively that he received a cent of the hire. The proof shows that Smith had hired a number of other negroes to Claybough & Co., in the same year, before he got possession of the Pointer negroes, and that it was agreed that this hire was to be paid during the year by Claybough & Co., letting Smith have pig iron from the furnace, as they could spare it. It further shows that the $4,500 hire of the Pointer negroes was due 1st of April, 1864, and that Clay-bough & Co. failed to meet this 'payment at the time, and that Smith repeatedly and urgently pressed them for payment of this debt, urging at some times as a reason why he wanted the money that he had bought cotton and wanted to pay for it, and must have the money for this purpose.
*147 Matters continued in this way during the summer, until the 20th of September, 1864, when Claybough & ■Co. let Smith take a car load of iron to Selma, which he sold, and was charged with the proceeds on their books.
After this, several other car loads of iron were turned over to Smith, which were sold at the same place, and the proceeds charged to him on their books. Conceding, without going into a calculation as to the precise amount so received, that the amount received from the proceeds of iron was sufficient to pay the $7,500, due for hire and clothing of Pointer’s negroes, was it a payment on the Pointer debt, or on the ■other debt due from Claybough & Co. The proof shows clearly that there was not an appropriation of this payment specifically, either to the Pointer debt, or to the other debts for the hire of negroes due from Claybough & Co., either by Claybough & Co., or by Dr. Smith. In fact, it pretty clearly appears that at the time of the receipt of this money, neither Clay-bough & Co. nor Smith thought of the question, to which debt the proceeds of this iron should be applied.
Claybough & Co. simply charged him on their books with the amount. Claybough himself, the business manager of the firm, insists in his deposition, that he thought the Pointer debt was paid, as it was first due, and due at a day fixed, to-wit: the 13th of April, 1864, but at the same time admits that as far as he recollects, he thought nothing about it at the time of the payment of the money. That this is the true state of the case, and that the idea of the applica *148 tion of this money to the Pointer debt was an after thought, ls pretty clearly established, not only by this direct proof, but by the fact that Smith held the written contract of Claybough & Co. for payment of this hire, and remained about the furnace certainly till December 25th of that year, and yet, this contract was not taken up, or cancelled, nor as far as we can see, any claim made that it was discharged.
Smith, it is true, insists that this money should be a payment on the other debts, and not the Pointer debt, and in this we think he claims what is to him an after thought, and can not be substantiated. In fact it is not creditable to his assumption of perfect fairness and good faith throughout this record.
The fact is, that this money was received on general account, without any agreement of either party that it should be paid upon any particular' debt, was so charged on the books of Claybough & Co. at the time so mentioned by Smith, and must be so treated by this Court.
It is then insisted, that by law this payment is to be appropriated to the payment of the Pointer debt, as due at a day certain, while the other debts were due at no definite date, but were to be paid in pig, iron as it could be spared from the furnace.
As there was no application of these payments made by either party at the time, it is insisted that the law makes the application to the Pointer debt.
It was held at an early day in our State, in the the case of Reynolds v. McFarland, 1 Tenn. R., Cooper’s Ed., 488, that “after property or money *149 is paid, to a creditor, to whom the debtor owes more than one account, he loses all power of directing on what account it shall be paid. The direction of the person paying must be given at, or previous to, the time of payment.” In the case of Bussey v. Gant’s administrator, 10 Hum., 241, Judge McKinney lays down the general rule to be in this State, “that a debtor, owing different debts to the same person, has the right to apply the payment at the time when made to either; but if he fails to do so, and the payment be general, the creditor may apply it (that is, at the time of payment), and when no appropriation is made by either party, the law will apply it according to the intrinsic justice of the case.” After stating some qualifications of this general rule, he adopts the rule of the civil law, “that where the application was not made by the parties, and where it became necessary for a court of justice to direct it, the payment ought to be applied to the debts which lie heaviest on the debtor, and which it concerned him most to pay.” Hence he held that a payment should be applied by the court to a debt on which interest was accruing, and which was a lien on land, rather than on one not having these incidents. This may be laid down as the law of Tennessee.
This payment, however, having been made in Alabama, the rule of law in that State would govern, if this be a case for an application of the doctrine -at all. The case of Harrison v. Johnston, 27 Ala. R., 453, is referred to by counsel as settling the law in favor of complainants, in that State.
*150 The general rule is stated by the court to be,, “that when partial payments are made by one owing distinct and separate debts, the law, if called upon to' make the application, will apply the payment to the debt which is least secured or most precarious — a different rule applying, however, in case of factors and .commission merchants and their customers.
The court, however, go on to say: “ the general rules, as we understand them, do not apply in every case, as where the character of the dealings between the parties is such as to show that it was not the intention of the parties that the payments should be thus applied.”
We see nothing in the facts of this case to make this rule have any application, as the debts were all due by the same parties, and were, so far as we can see, on equal footing: so that at least we would be brought back to the inquiry as to what can be gathered from the facts to have been the actual character of the transaction at the time. This, as we have seen, is clearly shown to have been a .simple payment on general account, and we can see no reason to treat it in any other light — that is, a payment on all due from Claybough & Co. for negro hire and for clothing to be furnished the negroes hired.
It may be doubted whether the rule as to the application of payments by law has proper application to this case however, as such rules are found in the •books, applied as between the debtor and creditoi’, and we have seen no decision in which they have ' been applied to a case like this, where an agent is- *151 sought to be charged with receipt of money by his principal, solely on the principle of application of payment by this rule of law, which might be enforced as between debtor and creditor.
The simple question of fact however here, is, did he receive the money of his principal; not whether he will be held to have received it, by virtue of a rule that is applied as between debtor and creditor, based solely on the relations existing between them as such.
We conclude however, that the money received for the iron was received on general account, and must be applied pro rata as a credit on the whole indebtedness of Claybough & Co. to Smith at the time such payment was made, and he must be charged with such pro ratas as so much Confederate money thus received at the time.
It is next insisted by complainants that this money was invested in cotton, and that the value of the cotton when sold afterwards by Smith, is what he is to be charged with.
We have looked into this entire body of proof, weighed it carefully, and conclude that complainant utterly fails to make out his case in this branch of it. There is not a word of proof in the record, that shows that Smith ever invested one dollar of the money received for the iron in cotton, either for himself or any one else.
The nearest to it that we find, is the statement proven to have been made by him, when dunning Claybough for the money, or Warwick, a young part *152 ner of the firm — that he had engaged cotton and wanted the money to pay tor it. This raises thé presumption that the fact was so, but Smith explains this in his deposition by saying this was an excuse got up by him for pressing Claybough & Co., and that he did not wish it known or understood that he had money; on the contrary, wished to make the impression that he did not have money with him. It being positively denied in the answer, that any cotton was purchased, the issue is' made, and should be sustained by some proof in order to a decree in favor of complainants on this aspect of the case.
While we can see many circumstances which were well "calculated to arouse the suspicions of Pointer, that he had not been fairly dealt with, and were calculated to point such suspicion to the fact, that his money had been invested in cotton, we can see nothing which would enable us judicially to so hold. Smith is shown at the end of the war to have had an interest in a considerable amount of cotton. He sent about two hundred and eighteen or two hundred and twenty-three bales to French & Co., at Nashville, in -1865, and he seems to have been in cotton speculations generally in that year. The ability to purchase this cotton is abundantly shown in the record, and the amount of money deposited by him with various parties for the purchase of cotton is proven, and even the purchase of all of it satisfactorily accounted for. This was purchased in 1863. We need not go into the details of the proof on this question. The fact remains as the deliberate conclusion to which we are led, that no cot *153 ton is shown to have been purchased by Smith in the year 1864, after he got control of Pointer’s negroes. He cannot therefore be charged with the price of cotton, either at Nashville or any where else, as was done by the Chancellor. He is to be charged, however, with the pro rata, or rather as having received the pro rata' proceeds of iron on this debt, as we have said, and which he did not invest in cotton. We cannot see that he was charged actively with the duty of investing these hires in cotton. On the contrary, it was left clearly in his discretion, as to what he should do with the hire. He seems to have failed to invest it at all for the benefit of Pointer, and the money probably died on his hands.
He, however, had only paid out Confederate money as expenses incurred for negroes, and having received back an amount, as we think, sufficient to meet their expenses, and reimburse himself in kind, he must be held to have had all claims of this kind satisfied.
In reference to compensation claimed by Smith for his services, we do not think it can be allowed him. Mr. Story says, vol. 1, s. 468, on this subject: “ Courts of equity adopt very enlarged and liberal rules in regard to the rights and duties of agents, and in all cases when the duty of keeping regular accounts and vouchers is imposed upon them, they will take care that the omission to do so shall not be used as a means of escaping responsibility or of obtaining undue recompense. If, therefore, an agent does not, under such circumstances, keep regular accounts and vouchers, he will not be allowed the com= *154 pensation which otherwise belong to his agency.” He says further: “ Courts of equity do not in such cases proceed on the notion that strict justice is done be-between the parties, but upon the ground that it is the only justice that can be done, and that it would be inequitable to suffer the fraud or negligence of the agent to prejudice the rights of his principal.”
We think this a very proper case in which to apply this, rule. Smith had the property with him in another State. He claims to have been at large expense in executing his agency, and that much labor and time were given thereto. Yet there is no regular account kept of his expenditures, nor of his receipts. He admits in his answer that he had received enough to cover the expenses of clothing and shoes. No account is kept of this money, nor is how much was received and spent shown It is claimed that he was in the midst of the danger and turmoil of war, but the proof shows that there was no special danger to parties in the region where he was, and he was not in the army, but only a citizen favorable to the southern cause — intensely so as would seem from this record — and he was in the midst of his friends, and the sequel has not shown that he lost anything by violence, or was ever imperiled in person.
This, taken in connection with his conduct after his return; his pressure on the complainants to pay between $3,000 and $4,000 to reimburse him, where his own expenses as far as incurred were ' paid in Confederate money, then worth seven to one, part of the time less; all these, together with a number of other *155 things in the record, satisfy us that he has not dealt with the frankness and fairness that should have characterized his conduct- in this matter.
In addition to this, we think he has by his conduct induced the suspicions that caused this suit to be brought, not only by contradictory statements made by himself in reference to his collecting or receiving money of Pointer’s, but with reference to his having bought cotton at all in. the South, and also the artifice by which we strongly suspect he endeavored to make a speculation in the Noble & Co. note, by buying it at ten cents in the dollar, when the parties were perfectly good — he representing them as hopelessly broke, and that he only wished to purchase the debt because he owed them and could save it in that way perhaps — when it turns out he never owed them a cent. It is true, this statement is not very clearly made out in the proof, yet it is distinctly charged in the bill circumstantially,- and only evaded in the answer, not answered.
In view of all these circumstances, we feel bound in disposing of this case, while reversing the decree of the Chancellor, to tax the defendant with -all the costs, both in this Court and the Court below.