Baldwin v. Flagg.

---

### ABRAM H. BALDWIN

*v.*

### JENNIE M. FLAGG and husband.

A mortgage was given by a married woman, on her own lands, to secure the payment of $11,000, representing, partly, moneys due the mortgagee, a stock-broker, for losses theretofore incurred by the mortgagor's husband; partly, similar losses incurred on the mortgagor's own account, and partly, to secure any further advances, not exceeding $4,000, which the mortgagee might make on account of subsequent stock speculations of the mortgagor through the mortgagee.—*Held,*

(1) That the mortgage was a valid security for so much of the consideration as represented the husband's debt to the mortgagee.

(2) That it was also valid for so much as represented the mortgagee's losses incurred in *bona fide* purchases or sales of stock by the mortgagee for account of the mortgagor, and at her request, including commissions, interest and premiums for money used in carrying her stock.

(3) That a stipulation by the mortgagee that he would not "assign or dispose of the mortgage until his future advances, amounting to $4,000, had actually been made," would not prevent his foreclosure of the mortgage for the sum actually advanced and due thereon, although such advances did not amount to $4,000.

On bill to foreclose. On final hearing on pleadings and proofs.

*Mr. H. A. Root,* of New York, and *Mr. C. Parker,* for complainant.

*Mr. A. Q. Keasbey,* for defendants.

Baldwin v. Flagg.

THE CHANCELLOR.

The bill is filed to foreclose a mortgage dated August 26th, 1880, given by the defendants to the complainant, on land in Summit township, in Union county, and made to secure the payment of a bond of the same date given by the defendants to the complainant, in the penalty of $23,126.88, and conditioned for the payment of $11,563.44 and interest, on demand. The mortgage recites that the defendants were, at the date thereof, justly indebted to the complainant in the sum of $11,563.44, mentioned in the condition of the bond; that its payment was secured by the bond, and that of that sum $7,563.44 were due from the defendants to the complainant, and the balance, $4,000, was security for future advances. The title to the mortgaged premises was, when the mortgage was given, and still is, in Mrs. Flagg, and she alone has answered. By the answer she admits the giving of the bond and mortgage, and sets up several defences. One is that the bond and mortgage were in fact executed by her, at the solicitation of her husband, for his accommodation and as surety for him, and that all the promises and covenants contained in them were promises to pay his debts and to answer for his defaults and liabilities, and were, as she insists, consequently invalid and created no lawful obligation against her, under the laws of this state, where she resided when these instruments were made and where the mortgaged premises are.

NOTE.—In the following cases it has been held that the broker could not recover from his principal "differences" on stock-jobbing operations: *Green's Case,* 7 *Biss. 338; Grizewood* v. *Blane,* 11 *C. B. 526; Levy* v. *Loeb,* 85 *N. Y. 365; Gregory* v. *Wendell,* 39 *Mich. 337; Bryan* v. *Lewis, Ry. & Moo. 386; Godman* v. *Meixsel,* 65 *Ind. 32.*

In the following cases it was held that the broker could recover: *Rumsey* v. *Berry,* 65 *Me. 570; Warren* v. *Hewitt,* 45 *Ga. 501; Hatch* v. *Douglas,* 48 *Conn. 116; Pidgeon* v. *Burslem,* 3 *Exch. 465; Woods* v. *Merrill,* 57 *Cal. 435; Story* v. *Salomon,* 6 *Daly 531,* 71 *N. Y. 420; Wynkoop* v. *Seal,* 64 *Pa. St. 361; Brown* v. *Speyers,* 20 *Gratt. 296; Smith* v. *Bouvier,* 70 *Pa. St. 325; Young's Case,* 6 *Biss. 53; Appleman* v. *Fisher,* 34 *Md. 540; Durant* v. *Burt,* 98 *Mass. 161; Thacker* v. *Hardy, L. R. (4 Q. B. Div.) 685,* 18 *Am. Law Reg. (N. S.) 258, note;* see *Oldershaw* v. *Knowles,* 101 *Ill. 117.*

If the original contracts were void on account of illegality, securities given to the broker for the payment of moneys advanced by him to pay losses result-

Another defence is that as to $3,193.01 of the $7,563.44 men-
tioned in the mortgage, they were for the amount of alleged
losses incurred by her husband in two partnership stock specula-
tions, in one of which he and the complainant (the latter acting
as broker as well as being partner in both) were jointly inter-
ested, and in the other he and one D. M. Ripley, the com-
plainant's confidential agent, and the complainant were the
parties in interest, and that she never intended, as the complain-
ant well knew, that the mortgage should cover those losses which
occurred in transactions in which she had no interest and of
which, as she alleges, she had no information.   A third defence
is that the bond and mortgage were obtained from her husband
on a special understanding to the effect that the complainant,
who is and was a resident of the city of New York, and a stock
broker carrying on the business of buying and selling stocks
and other securities on commission, at the New York Stock Ex-
change, should, on the order of her husband, buy and sell stocks
and other securities in a speculative stock account which the
complainant had, previously to the giving of the bond and mort-
gage, been carrying on as a stock-broker for him; and that the
complainant should in no case claim more than the difference
arising out of such purchases and sales; that is to say, that the
complainant, in consideration of brokerage commissions on pur-
chases and sales, and interest on money furnished by him to
carry the stock and securities bought, should buy and sell stocks
and other securities for the speculative account, on the orders of

ing therefrom, are not void but enforceable, *Faikney* v. *Reynous, 4 Burr. 2069;*
*Petrie* v. *Hannay, 3 T. R. 418; Jessop* v. *Lutwyche, 10 Exch. 614; Knight* v.
*Cambers, 15 C. B. 562; Rosewarne* v. *Billing, 15 C. B. (N. S.) 316; Beeston* v.
*Beeston, L. R. (1 Exch. Div.) 13; Pyke's Case, L. R. (8 Ch. Div.) 754; Clark*
v. *Foss, 7 Biss. 540; Owen* v. *Davis, 1 Bail. 315; Marshall* v. *Thruston, 3 Lea*
*740; Third Nat. Bank* v. *Harrison, 10 Fed. Rep. 243; Jackson* v. *Foote, 12*
*Fed. Rep. 37; Kingsbury* v. *Suit, 66 N. C. 601; Williams* v. *Carr, 80 N. C. 294;*
*Poorman* v. *Mills, 39 Cal. 345; Brothers* v. *Strassberger, 2 Woods 554; Jones*
v. *Sevier, 1 Litt. 50; Greathouse* v. *Throckmorton, 7 J. J. Marsh. 16; Williams*
v. *Tiedemann, 6 Mo. App. 269;* but see *Barnard* v. *Backhaus, 52 Wis. 593;*
*Pawle* v. *Gunn, 4 Bing. N. C. 445; Fareira* v. *Gabell, 89 Pa. St. 89; Cannan*
v. *Bryce, 3 B. & Ald. 179.*

Baldwin *v.* Flagg.

Mr. Flagg, upon the condition and with the special provision and agreement that in no case was Mrs. Flagg, as nominal prin-cipal, or her husband, as the real principal, to be under any obligation to take delivery or transfer of any of the stock or securities, and when the differences between the purchases and sales were favorable to the account it should be credited there-with, and whenever the complainant advanced money to pay differences on purchases and sales which showed a loss, the amount of the differences should be charged against the account, the complainant agreeing, in consideration of receiving the secu-rity of the bond and mortgage and the commissions and interest, to make purchases and sales on speculation on the account, in accordance with Mr. Flagg's orders, until he should have advanced, over and above the profit, differences to be credited to the account, for differences, losses, cash drafts, commissions and interest, the whole amount of the bond and mortgage; and no part of the amount of the bond and mortgage was to be due or payable at any time during the progress of the speculations, unless the amount of the complainant's advances, to cover differ-erences, losses, drafts, commissions and interest, should equal the amount of the bond and mortgage, over and above all profit differences.   Mrs. Flagg insists that this was a wagering con-tract and therefore illegal and void, and that hence the payment of the bond and mortgage cannot be enforced.   Still another defence is that this suit was prematurely brought, inasmuch as, as she insists, the complainant, having agreed to make advances

See, further, the following articles and annotated cases : *1 Cent. L. J. 200; 7 Id.* *41; 10 Id. 221, 241 ; 3 Crim. Law Mag. 1; Melchert v. Am. Union Tel. Co., 11* *Fed. Rep. 193, 201, note; Van Horn v. Gilbough (Pa.), 21 Am. Law. Reg.* *(N. S.) 176, note.*

If a profit had been made on the transaction, the broker could have been compelled to pay it over to his principal, *Warren v. Hewitt, 45 Ga. 507,* and cases cited ; *Brooks v. Martin, 2 Wall. 70; Pointer v. Smith, 7 Heisk. 137 ;* *Bonsfield v. Wilson, 16 M. & W. 185 ; Daniels v. Barney, 22 Ind. 207, 32 Ind.* *19 ; Murray v. Vanderbilt, 39 Barb. 140 ; United States Ex. Co. v. Lucas, 36* *Ind. 361; Wilson v. Owen, 30 Mich. 474;* see *Heckman v. Swartz, 50 Wis. 270 ;* *Jenkins v. Power, 6 M. & S. 282 ; Jones v. Taylor, 2 Pugs. (N. B.) 391 ;* *Pfeuffer v. Maltby, 54 Tex. 454.*—REP.

to the amount of $4,000, did not perform his agreement, but
refused to make advances and buy and sell stocks or other secu-
rities for her husband, while as yet the difference in the account
in the complainant's favor did not amount to the $4,000; and
she insists that the mortgage is not due or payable until advances
to that amount shall have been made. Another defence is that
the complainant has made illegal charges for interest and com-
missions.

The history of the transactions involved is as follows : Flagg
opened an account with the complainant January 28th, 1880,
and bought and sold stocks on it, on his own account, up to the
time when he began to make such sales and purchases in the
name and for the account of his wife, which was June 15th,
1880. He was interested also as partner in the two accounts
before mentioned. One (called the Flagg and Baldwin account),
of himself and the complainant, began May 6th, 1880, and closed
on the 13th day of July following. The other (called the Flagg
and Ripley account), of himself and Ripley and the complainant,
began May 21st, 1880, and was closed on the 7th of June fol-
lowing. On the 15th of June, 1880, Mrs. Flagg wrote the com-
plainant a letter, enclosing therein her note for $4,500, in which
she said she sent the note as margin in a speculation stock ac-
count, which she wished to open with him, and requested him
to transfer to her name the personal account of her husband on
his books, and to follow the latter's directions in all matters con-
nected with her account. The account was continued, and the
transactions conducted accordingly in her name and for her ac-
count, under the control and direction of her husband, until
August following, when the complainant, in view of the losses
which had been incurred, was unwilling to go further without
further security than was afforded by the note. The bond and
mortgage were then given. As before stated, they are dated
August 26th, 1880. By her letter of that date to the complain-
ant, Mrs. Flagg acknowledges the receipt from him of a state-
ment showing the condition of her account, from which it
appeared that at that day's prices she was indebted to him in the
sum of $4,370.43, and she acknowledged the correctness of the

statement and agreed that it should be an account stated. She also thereby ratified and confirmed everything her husband had done, with or through the complainant, for her. She also, by that letter, authorized and empowered her husband to act for her in the future as her agent and attorney, in the control and management of her account with the complainant, and in the purchase and sale, by and through him, of any and all stocks, bonds and other securities, and agreed to ratify and confirm and adopt, as her own, every such transaction. Her husband, by another letter of the same date to the complainant, acknowledged that he had received a statement of the joint accounts before mentioned, that it was correct, and that there were due to the complainant from him on the one (Flagg and Baldwin's) $2,863.05, and on the other (Flagg and Ripley's) $329.96 (altogether $3,193.01), and agreed that the statement should be an account stated. By letter of the same date to Mr. and Mrs. Flagg, the complainant acknowledged the receipt of the bond and mortgage, and stated that of the $11,563.44 which it was made to secure, $7,563.44 were for the amount of their indebtedness to him, and that the rest, $4,000, was to cover future advances. And he thereby agreed that he would not assign or dispose of the bond and mortgage before the $4,000 of future advances had been made; and added that those advances were to be charged to the personal account of Mrs. Flagg only, and that no future losses in the joint accounts before mentioned were to be considered as part of the $4,000 of advances; and that it was understood and agreed that he should have the sole and absolute control of those joint accounts, and that all orders given by Mrs. Flagg, or by Mr. Flagg for her, after that date, were to be charged to her personal account. The whole sum mentioned in the mortgage, $11,-563.44, was credited to Mrs. Flagg in her account under date of November 4th, 1880. The account continued until March, 1881. On the 14th of that month the complainant demanded of Mrs. Flagg the payment of $2,975.07, as the amount due him on her account (the amount of the mortgage had, as before stated, been credited), and notified her that on payment of that • sum he would deliver to her order one hundred shares of the

Baldwin *v.* Flagg.

first preferred stock of the Chesapeake and Ohio Railroad Company, then in his office, and standing to the credit of her account, and that on failure to pay the money demanded he would sell the stock at auction on the 16th of March. The money not being paid, the stock was sold accordingly, and the sale produced such a sum of money, as that when it was credited to Mrs. Flagg there was a balance of account in her favor (crediting the mortgage) of $653.93. The difference, $10,909.51, between the amount of the mortgage and that sum, is the amount which, with interest thereon from March 17th, 1881, is claimed to be due on the mortgage. The note for $4,500 has been given up to Mrs. Flagg.

The first of the defences, as they are above stated, is that Mrs. Flagg executed the bond and mortgage merely as security for her husband. This defence must have reference to his share of the losses on the joint accounts, for the other indebtedness was her own, and the advances were to be made not for him, but for her.

It is enough to say on this head, that it is established in this state that a mortgage made by a married woman on her own property, to secure the debt of her husband, is valid. *Campbell* v. *Tompkins, 5 Stew. Eq. 170,* affirmed on appeal, *6 Stew. Eq. 362.* That Mr. and Mrs. Flagg were, when the mortgage was given, indebted to the complainant in the sum mentioned in the mortgage in that behalf, $7,563.44, is proved clearly. By his letter of the same date as the mortgage, Flagg acknowledged that he owed the complainant $3,193.01, and Mrs. Flagg, by her letter of that date, acknowledged that she, herself, owed him on her own account $4,370.43, which two sums together make the amount, $7,563.44, mentioned in the mortgage as being then due from both of them. It appears, by the complainant's letter to them of the same date, that it was understood that no future losses in the joint accounts called the Flagg and Baldwin and Flagg and Ripley accounts, should be considered any part of the $4,000 advances to be made. The three letters just referred to were all part of the same transaction, and were written and signed to witness the matters stated in them. It appears from

them that Flagg's share of the losses on the joint accounts was understood to be secured by the bond, but that future losses by him on those accounts, or either of them, were not to be. Mrs. Flagg is bound by the statements of those instruments. Moreover, Flagg testifies that he told her that the mortgage was given to secure the losses incurred in the joint accounts. It may be observed that she was not defrauded by the complainant in the matter in any way, and her husband, who acted for her, is a lawyer, and had then been practicing in New York as such for many years. He testifies also that he is an expert (and he has given his evidence in this suit as such in her behalf) in the matter of stock transactions in Wall street, as conducted at the present day, having made them, as he says, a study as a lawyer, and having, when the mortgage was given, been conversant with them practically for four or five years.

There seems to have been no attempt to sustain the allegation that the complainant has made illegal charges for commissions, and it appears by his testimony, which is uncontradicted on the point, that he has charged for interest only what he paid. There was a full understanding between him and Mrs. Flagg on the subject of the charges to be made for interest. By her letter to him of January 20th, 1881, she expressly authorized him to charge to her account the interest and commissions he might pay for money used to carry whatever stock he then had or should thereafter have for her, at such rates as he should pay therefor, and she thereby agreed to pay him such interest, including the premium he should pay for the money above legal interest. The complainant swears that he charged only what he paid, and that he finds but two charges for extra interest in the accounts—one of $23.75, in Mr. Flagg's account, under date of April 9th, 1880, and the other of $111.42, in Mrs. Flagg's account, under date of February 28th, 1881.

To consider the defence made on the ground that the transactions as indemnity, in which the mortgage was given, were illegal. Part of the money secured was, as already stated, the amount of Flagg's share of the losses in the joint accounts. The transactions in which those losses were incurred, as well as

those on individual account, were legal. The complainant swears that every transaction in which Mr. and Mrs. Flagg were concerned, and every one in the joint accounts, was an actual *bona fide* transaction; that the stocks bought were paid for and received, and the stocks sold delivered and the checks therefor received and deposited by him in bank. And in this connection it may be stated that the Flagg and Ripley account appears to have been a speculation in one hundred shares of Western Union Telegraph Company stock, and not only is the stock entered on the account " long," but the complainant swears that he, at the request of Flagg, on beginning the account, bought it and paid for it, and carried it for the joint account. The complainant's testimony as to his purchases and sales of the stock bought and sold for the defendants, whether on one account or the other, is in itself decisive as to the legality of the transactions in question. He swears that they were all actual transactions, and not mere agreements to pay differences, that they were *bona fide* purchases and sales, and not mere wagering contracts; and he brings into court the checks given by him on the purchase of the stocks. It is urged, however, that as to the transactions for the account of the defendants alone, they were evidently, notwithstanding the testimony of the complainant concerning their character, in fact " short," and therefore mere gaming transactions; substantially wagers upon the price which the stocks would bear in the market at a future day, and that an actual sale or purchase was not contemplated in any case, but all the transactions of apparent purchase and sale were only colorable and fictitious, and therefore illegal, and within our statute against gaming. Here it may be remarked that while Mr. Flagg says that none of the transactions involved represented a real transaction in stocks, it is quite clear that he speaks merely of his own views on the subject; for he says the accounts represent what are called " long " and " short " transactions (and he explains that by " long transactions," he means those where an order is given to a broker to buy, or, in the case of these accounts, where the broker receives an order to credit the account with certain stocks), and he does not deny that the complainant in

fact bought the stocks when he was ordered by him to do so. He says he never inquired and did not care whether the complainant bought or sold on the stock exchange in accordance with his orders or not. He speaks of the intention of the parties, and not as to what was in fact done; and so far as he speaks of the complainant's intentions on the subject, he is contradicted by the latter. A "short" sale of stock is a sale before purchase, usually with a view of purchasing at a future time, at a lower price, for delivery. The *modus operandi* of such a sale through a broker is as follows : On receipt of the order to sell short from the customer, the broker sells the stock and notifies the customer of the sale, giving him the name of the purchaser. When the time for delivery arrives, he delivers the stock, but in the interest of and for the customer (since the latter sold. the stock without owning it), borrows it to deliver, giving his check for it (he pays for the use of the stock for the transaction), and delivers the stock to the buyer, and receives the money for it. If, to replace the stock borrowed, a loss is met, it is, of course, the customer's loss, and the broker looks to the "margin" in his hands for indemnity in that regard, as well as for his commissions &c. So that there is, in every such transaction, provision for an actual delivery of the stock. Such transactions have, in actions by and against the brokers, been held to be legal both in New York and elsewhere. *Knowlton* v. *Fitch, 52 N. Y. 288; White* v. *Smith, 54 N. Y. 522; Smith* v. *Bouvier, 70 Pa. St. 325; Thacker* v. *Hardy, L. R. (4 Q. B. D.) 685; Ex parte Rogers, L. R. (15 Ch. D.) 207; Maxton* v. *Gheen, 75 Pa. St. 166;* and see, also, *Lehman* v. *Strassberger, 2 Woods C. C. 554,* and *Bigelow* v. *Benedict, 70 N. Y. 202.* ·

In the transactions now under consideration the complainant was acting as a broker and not at all as a principal. The speculations were not his but Mrs. Flagg's. The gain and the loss were hers, not his. On her order and for her he actually bought stocks and became responsible to the seller for the value thereof, and looked to her for the indemnity to which, under the circumstances, he, as an agent, obviously was entitled from his principal. Not only is *bona fide* dealing in stocks lawful in New

York, but it is lawful here and elsewhere. Where the broker buys or sells the stock in fact, the transaction is, so far as he is concerned, legitimate, whether his principal takes or intends to take the stock ultimately or not. It is otherwise, however, of course, where he is the agent of his customer in making agreements which are mere bets on the market value of stock at a future day, and which, therefore, neither involve nor contemplate any purchase or sale. To treat the broker as a principal in either case would be contrary to the facts, but while, in the latter case, he is of course chargeable with the knowledge that the transaction is a mere illegal, wagering contract which the law will not countenance, and in respect to which and his dealings therein it will give him no aid, in the former, his own action being a matter of legitimate business, he is not responsible either for the intention or future action of his principal in the premises, and cannot be affected thereby.

To dispose of the remaining defence, that this suit is prematurely brought: This is based on the claim that the complainant not only agreed to advance the $4,000 (which it is insisted he has not done), but agreed also that he would not take any steps to enforce payment of any of the money which the mortgage was given to secure until he had done so. The agreement between the parties on those heads is to be found in the bond and mortgage, the complainant's letter of the same date (August 26th, 1880), and his "stipulation" of March 10th, 1881, in a suit brought by Mrs. Flagg against him, in that month, in the court of common pleas of the city of New York, for the surrender to her of the bond and mortgage and the note of $4,500. The stipulation, however, does not differ in any way from the agreement which the letter evidences. The language is substantially the same. The parol testimony offered by the defendants to prove that the complainant, before the mortgage was given, agreed that in consideration of the giving of it he would advance the $4,000, is not competent. The complainant, however, swears that there was no agreement or understanding of any kind on the subject except that shown by his letter, which was merely that he would not "assign or dispose of the bond

and mortgage before the $4,000 of future advances had been made." And it is noticeable that the stipulation drawn after litigation between these parties had commenced, is not that the complainant will not seek to enforce the payment of the money which he claims is due on the bond and mortgage, but that he will not "assign or dispose of" those instruments until the sum of $4,000 of future advances has "actually been made."

What the agreement was, is evidenced by the language of the letter and stipulation. It was that the complainant would not part with the ownership of the bond and mortgage until after the whole of the $4,000 had been advanced. The defendants' object in obtaining the agreement is plain. It was to keep the bond and mortgage in the complainant's hands, and out of those of strangers, to give the defendants opportunity to redeem them by means of their speculations through the complainant until the $4,000 were all gone. The agreement did not bind the complainant to advance any money at all, and its language cannot be held to imply an agreement that he would do so, or that he would not take any steps to enforce payment until after he had advanced the whole of the $4,000. Not only is there no necessary implication to that effect, but it would not be a reasonable inference. Had the parties intended to provide that there should be no enforcement of payment unless the whole amount had been advanced, they would have done so. Mr. Flagg, it must be remembered, is a lawyer. The complainant would have been at liberty to enforce payment of the $7,563.44 and interest, if he had not advanced any money at all. Where a mortgage is given to secure future advances by the mortgagee, and he stipulates that he will make advances to a certain amount, and he makes advances, but not to the stipulated amount, he may enforce his claim for repayment by foreclosure for any amount he may have advanced. *Dart* v. *McAdam, 27 Barb. 187;* *Coleman* v. *Galbreath, 53 Miss. 303;* *Robinson* v. *Cromelein, 15 Mich. 316.* The case of *Maryott* v. *Renton, 6 C. E. Gr. 381,* cited by defendants' counsel, is not opposed to this doctrine. It merely holds that a foreclosure suit begun before the mortgage is due cannot be maintained. Though there was there an agreement

to advance $9,000, which had been only partly performed (the mortgagee having advanced only $3,000, and refusing to advance any more), the decision was not put on that ground, but on the ground that the time when, according to the agreement of the parties, the mortgage was to become due had not arrived when the suit was begun. Not only was no stress laid on the fact that the mortgagee had refused to fulfill his agreement as to the amount of advances, but no reference was made to it. The facts of that case were, as appears by the opinion, as follows: Renton held two mortgages of different dates, both given by Maryott to him, on the same premises. The first one was made to secure the payment of $6,000. When the second was given the first was past due. After the maturity of the first, and before the giving of the second mortgage, Renton agreed with Maryott to advance him $9,000 and take a new mortgage to secure the amount of the first mortgage, and the advances he should make. To save the expense of revenue stamps the new mortgage was made to secure the advances only, and the first mortgage was let stand. The agreement was that the $6,000 of the first mortgage was to run without interest, and not be due until the maturity of the second mortgage, which was February 1st, 1868. Renton, who, as before stated, had advanced only $3,000 of the $9,000 under the second mortgage, and refused to advance more, began his suit August 27th, 1867. It will be seen that the case rather supports than antagonizes the principle above enunciated. But, further, the complainant swears, and the evidence sustains his statement, that he has advanced under and on the security of the mortgage more than $4,000. When the sale of stock was made by him, pursuant to notice on the 18th of March, 1881, there was a balance of about $3,000 due him on the account after crediting the amount of the mortgage, that is, after crediting the whole of the $4,000. So that there was then due to him from Mrs. Flagg, for advances and commissions and interest since the giving of the mortgage, about $7,000. The proceeds of the sale were $3,629. Applying them to the account, there remain due to the complainant $10,909.51, for which, with interest from March 17th, 1881, he is entitled to a decree.